(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## STOLT-NIELSEN S. A. ET AL. *v.* ANIMALFEEDS INTERNATIONAL CORP.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 08–1198.   Argued December 9, 2009—Decided April 27, 2010

Petitioner shipping companies serve much of the world market for parcel tankers—seagoing vessels with compartments that are separately chartered to customers, such as respondent (AnimalFeeds), who wish to ship liquids in small quantities. AnimalFeeds ships its goods pursuant to a standard contract known in the maritime trade as a charter party. The charter party that AnimalFeeds uses contains an arbitration clause. AnimalFeeds brought a class action antitrust suit against petitioners for price fixing, and that suit was consolidated with similar suits brought by other charterers, including one in which the Second Circuit subsequently reversed a lower court ruling that the charterers' claims were not subject to arbitration. As a consequence, the parties in this case agree that they must arbitrate their antitrust dispute. AnimalFeeds sought arbitration on behalf of a class of purchasers of parcel tanker transportation services. The parties agreed to submit the question whether their arbitration agreement allowed for class arbitration to a panel of arbitrators, who would be bound by rules (Class Rules) developed by the American Arbitration Association following *Green Tree Financial Corp.* v. *Bazzle*, 539 U. S. 444. One Class Rule requires an arbitrator to determine whether an arbitration clause permits class arbitration. The parties selected an arbitration panel, designated New York City as the arbitration site, and stipulated that their arbitration clause was "silent" on the class arbitration issue. The panel determined that the arbitration clause allowed for class arbitration, but the District Court vacated the award. It concluded that the arbitrators' award was made in "manifest disregard" of the law, for had the arbitrators conducted a choice-of-law analysis, they would have applied the rule of

federal maritime law requiring contracts to be interpreted in light of custom and usage. The Second Circuit reversed, holding that because petitioners had cited no authority applying a maritime rule of custom and usage *against* class arbitration, the arbitrators' decision was not in manifest disregard of maritime law; and that the arbitrators had not manifestly disregarded New York law, which had not established a rule against class arbitration.

*Held:* Imposing class arbitration on parties who have not agreed to authorize class arbitration is inconsistent with the Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq.* Pp. 7–23.

   (a) The arbitration panel exceeded its powers by imposing its own policy choice instead of identifying and applying a rule of decision derived from the FAA or from maritime or New York law. Pp. 7–12.

      (1) An arbitration decision may be vacated under FAA §10(a)(4) on the ground that the arbitrator exceeded his powers, "only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice,'" *Major League Baseball Players Assn.* v. *Garvey*, 532 U. S. 504, 509 *(per curiam),* for an arbitrator's task is to interpret and enforce a contract, not to make public policy. P. 7.

      (2) The arbitration panel appears to have rested its decision on AnimalFeeds' public policy argument for permitting class arbitration under the charter party's arbitration clause. However, because the parties agreed that their agreement was "silent" on the class arbitration issue, the arbitrators' proper task was to identify the rule of law governing in that situation. Instead, the panel based its decision on post-*Bazzle* arbitral decisions without mentioning whether they were based on a rule derived from the FAA or on maritime or New York law. Rather than inquiring whether those bodies of law contained a "default rule" permitting an arbitration clause to allow class arbitration absent express consent, the panel proceeded as if it had a common-law court's authority to develop what it viewed as the best rule for such a situation. Finding no reason to depart from its perception of a post-*Bazzle* consensus among arbitrators that class arbitration was beneficial in numerous settings, the panel simply imposed its own conception of sound policy and permitted class arbitration. The panel's few references to intent do not show that the panel did anything other than impose its own policy preference. Thus, under FAA §10(b), this Court must either "direct a rehearing by the arbitrators" or decide the question originally referred to the panel. Because there can be only one possible outcome on the facts here, there is no need to direct a rehearing by the arbitrators. Pp. 7–12.

   (b) *Bazzle* did not control resolution of the question whether the instant charter party permits arbitration to proceed on behalf of this

Syllabus

class. Pp. 12–17.

(1) No single rationale commanded a majority in *Bazzle,* which concerned contracts between a commercial lender and its customers that had an arbitration clause that did not expressly mention class arbitration. The plurality decided only the question whether the court or arbitrator should decide whether the contracts were "silent" on the class arbitration issue, concluding that it was the arbitrator. JUSTICE STEVENS' opinion bypassed that question, resting instead on his resolution of the questions of what standard the appropriate decisionmaker should apply in determining whether a contract allows class arbitration, and whether, under whatever standard is appropriate, class arbitration had been properly ordered in the case at hand. Pp. 12–15.

(2) The *Bazzle* opinions appear to have baffled these parties at their arbitration proceeding. For one thing, the parties appear to have believed that *Bazzle* requires an arbitrator, not a court, to decide whether a contract permits class arbitration, a question addressed only by the plurality. That question need not be revisited here because the parties expressly assigned that issue to the arbitration panel, and no party argues that this assignment was impermissible. Both the parties and the arbitration panel also seem to have misunderstood *Bazzle* as establishing the standard to be applied in deciding whether class arbitration is permitted. However, *Bazzle* left that question open. Pp. 15–17.

(c) Imposing class arbitration here is inconsistent with the FAA. Pp. 17–23.

(1) The FAA imposes rules of fundamental importance, including the basic precept that arbitration "is a matter of consent, not coercion." *Volt* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 479. The FAA requires that a "written provision in any maritime transaction" calling for the arbitration of a controversy arising out of such transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U. S. C. §2, and permits a party to an arbitration agreement to petition a federal district court for an order directing that arbitration proceed "in the manner provided for in such agreement," §4. Thus, this Court has said that the FAA's central purpose is to ensure that "private agreements to arbitrate are enforced according to their terms." *Volt,* 489 U. S., at 479. Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must "give effect to the [parties'] contractual rights and expectations." *Ibid.* The parties' "intentions control," *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 626, and the parties are "generally free to structure their arbi-

tration agreements as they see fit," *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S. 52, 57. They may agree to limit the issues arbitrated and may agree on rules under which an arbitration will proceed. They may also specify *with whom* they choose to arbitrate their disputes. See *EEOC* v. *Waffle House, Inc.*, 534 U. S. 279, 289. Pp. 17–20.

(2) It follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so. Here, the arbitration panel imposed class arbitration despite the parties' stipulation that they had reached "no agreement" on that issue. The panel's conclusion is fundamentally at war with the foundational FAA principle that arbitration is a matter of consent. It may be appropriate to presume that parties to an arbitration agreement implicitly authorize the arbitrator to adopt those procedures necessary to give effect to the parties' agreement. See *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U. S. 79, 84. But an implicit agreement to authorize class action arbitration is not a term that the arbitrator may infer solely from the fact of an agreement to arbitrate. The differences between simple bilateral and complex class action arbitration are too great for such a presumption. Pp. 20–23.

548 F. 3d 85, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. GINSBURG, J., filed a dissenting opinion, in which STEVENS and BREYER, JJ., joined. SOTOMAYOR, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 08–1198

————

## STOLT-NIELSEN S. A., ET AL., PETITIONERS v. ANIMALFEEDS INTERNATIONAL CORP.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[April 27, 2010]

JUSTICE ALITO delivered the opinion of the Court.

We granted certiorari in this case to decide whether imposing class arbitration on parties whose arbitration clauses are "silent" on that issue is consistent with the Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq.*

## I

### A

Petitioners are shipping companies that serve a large share of the world market for parcel tankers—seagoing vessels with compartments that are separately chartered to customers wishing to ship liquids in small quantities. One of those customers is AnimalFeeds International Corp. (hereinafter AnimalFeeds), which supplies raw ingredients, such as fish oil, to animal-feed producers around the world. AnimalFeeds ships its goods pursuant to a standard contract known in the maritime trade as a charter party.[1] Numerous charter parties are in regular

——————

[1] "[C]harter parties are commonly drafted using highly standardized forms specific to the particular trades and business needs of the parties." Comment, A Comparative Analysis of Charter Party Agreements

use, and the charter party that AnimalFeeds uses is known as the "Vegoilvoy" charter party. Petitioners assert, without contradiction, that charterers like Animal-Feeds, or their agents—not the shipowners—typically select the particular charter party that governs their shipments. Accord, Trowbridge, Admiralty Law Institute: Symposium on Charter Parties: The History, Development, and Characteristics of the Charter Concept, 49 Tulane L. Rev. 743, 753 (1975) ("Voyage charter parties are highly standardized, with many commodities and charterers having their own specialized forms").

Adopted in 1950, the Vegoilvoy charter party contains the following arbitration clause:

> "Arbitration. Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act [*i.e.*, the FAA], and a judgment of the Court shall be entered upon any award made by said arbitrator." App. to Pet. for Cert. 69a.

In 2003, a Department of Justice criminal investigation revealed that petitioners were engaging in an illegal price-fixing conspiracy. When AnimalFeeds learned of this, it brought a putative class action against petitioners in the District Court for the Eastern District of Pennsylvania,

---

"*Subject to*" Respective American and British Laws and Decisions . . . It's All in the Details, 26 Tulane Mar. L. J. 291, 294 (2001–2002); see also 2 T. Schoenbaum, Admiralty and Maritime Law §11–1, p. 200 (3d ed. 2001).

asserting antitrust claims for supracompetitive prices that petitioners allegedly charged their customers over a period of several years.

Other charterers brought similar suits. In one of these, the District Court for the District of Connecticut held that the charterers' claims were not subject to arbitration under the applicable arbitration clause, but the Second Circuit reversed. See *JLM Industries, Inc.* v. *Stolt-Nielsen S. A.*, 387 F. 3d 163, 183 (2004). While that appeal was pending, the Judicial Panel on Multidistrict Litigation ordered the consolidation of then-pending actions against petitioners, including AnimalFeeds' action, in the District of Connecticut. See *In re Parcel Tanker Shipping Services Antitrust Litigation*, 296 F. Supp. 2d 1370, 1371, and n. 1 (JPML 2003). The parties agree that as a consequence of these judgments and orders, AnimalFeeds and petitioners must arbitrate their antitrust dispute.

B

In 2005, AnimalFeeds served petitioners with a demand for class arbitration, designating New York City as the place of arbitration and seeking to represent a class of "[a]ll direct purchasers of parcel tanker transportation services globally for bulk liquid chemicals, edible oils, acids, and other specialty liquids from [petitioners] at any time during the period from August 1, 1998, to November 30, 2002." 548 F. 3d 85, 87 (CA2 2008) (internal quotation marks omitted). The parties entered into a supplemental agreement providing for the question of class arbitration to be submitted to a panel of three arbitrators who were to "follow and be bound by Rules 3 through 7 of the American Arbitration Association's Supplementary Rules for Class Arbitrations (as effective Oct. 8, 2003)." App. to Pet. for Cert. 59a. These rules (hereinafter Class Rules) were developed by the American Arbitration Association (AAA) after our decision in *Green Tree Financial Corp.* v. *Bazzle*,

539 U. S. 444 (2003), and Class Rule 3, in accordance with the plurality opinion in that case, requires an arbitrator, as a threshold matter, to determine "whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class." App. 56a.

The parties selected a panel of arbitrators and stipulated that the arbitration clause was "silent" with respect to class arbitration. Counsel for AnimalFeeds explained to the arbitration panel that the term "silent" did not simply mean that the clause made no express reference to class arbitration. Rather, he said, "[a]ll the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue." *Id.,* at 77a.

After hearing argument and evidence, including testimony from petitioners' experts regarding arbitration customs and usage in the maritime trade, the arbitrators concluded that the arbitration clause allowed for class arbitration. They found persuasive the fact that other arbitrators ruling after *Bazzle* had construed "a wide variety of clauses in a wide variety of settings as allowing for class arbitration," but the panel acknowledged that none of these decisions was "exactly comparable" to the present dispute. See App. to Pet. for Cert. 49a–50a. Petitioners' expert evidence did not show an "inten[t] to preclude class arbitration," the arbitrators reasoned, and petitioners' argument would leave "no basis for a class action absent express agreement among all parties and the putative class members." *Id.,* at 51a.

The arbitrators stayed the proceeding to allow the parties to seek judicial review, and petitioners filed an application to vacate the arbitrators' award in the District Court for the Southern District of New York. See 9 U. S. C. §10(a)(4) (authorizing a district court to "make an order vacating the award upon the application of any party to the arbitration . . . where the arbitrators exceeded

their powers"); Petition to Vacate Arbitration Award, No. 1:06–CV–00420–JSR (SDNY) in App. in No. 06–3474–cv (CA2), p. A–17, ¶16 (citing §10(a)(4) as a ground for vacatur of the award); see also *id.*, at A–15 to A–16, ¶9 (invoking the District Court's jurisdiction under 9 U. S. C. §203 and 28 U. S. C. §§1331 and 1333). The District Court vacated the award, concluding that the arbitrators' decision was made in "manifest disregard" of the law insofar as the arbitrators failed to conduct a choice-of-law analysis. 435 F. Supp. 2d 382, 384–385 (SDNY 2006). See *Wilko* v. *Swan*, 346 U. S. 427, 436–437 (1953) ("[T]he interpretations of the law by the arbitrators in contrast to manifest disregard are not subject, in the federal courts, to judicial review for error in interpretation"); see also Petition to Vacate Arbitration Award, *supra*, at A–17, ¶17 (alleging that the arbitration panel "manifestly disregarded the law"). Had such an analysis been conducted, the District Court held, the arbitrators would have applied the rule of federal maritime law requiring that contracts be interpreted in light of custom and usage. 435 F. Supp. 2d, at 385–386.

AnimalFeeds appealed to the Court of Appeals, which reversed. See 9 U. S. C. §16(a)(1)(E) ("An appeal may be taken from . . . an order . . . vacating an award"). As an initial matter, the Court of Appeals held that the "manifest disregard" standard survived our decision in *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576 (2008), as a "judicial gloss" on the enumerated grounds for vacatur of arbitration awards under 9 U. S. C. §10. 548 F. 3d, at 94. Nonetheless, the Court of Appeals concluded that, because petitioners had cited no authority applying a federal maritime rule of custom and usage *against* class arbitration, the arbitrators' decision was not in manifest disregard of federal maritime law. *Id.*, at 97–98. Nor had the arbitrators manifestly disregarded New York law, the Court of Appeals continued, since nothing in New York

case law established a rule against class arbitration. *Id.*, at 98–99.

We granted certiorari. 557 U. S. \_\_\_ (2009).[2]

———————

[2] Invoking an argument not pressed in or considered by the courts below, the dissent concludes that the question presented is not ripe for our review. See *post*, at 1, 3–6 (opinion of GINSBURG, J.). In so doing, the dissent offers no clear justification for now embracing an argument "we necessarily considered and rejected" in granting certiorari. *United States* v. *Williams*, 504 U. S. 36, 40 (1992). Ripeness reflects constitutional considerations that implicate "Article III limitations on judicial power," as well as "prudential reasons for refusing to exercise jurisdiction." *Reno* v. *Catholic Social Services, Inc.*, 509 U. S. 43, 57, n. 18 (1993). In evaluating a claim to determine whether it is ripe for judicial review, we consider both "the fitness of the issues for judicial decision" and "the hardship of withholding court consideration." *National Park Hospitality Assn.* v. *Department of Interior*, 538 U. S. 803, 808 (2003). To the extent the dissent believes that the question on which we granted certiorari is constitutionally unripe for review, we disagree. The arbitration panel's award means that petitioners must now submit to class determination proceedings before arbitrators who, if petitioners are correct, have no authority to require class arbitration absent the parties' agreement to resolve their disputes on that basis. See Class Rule 4(a) (cited in App. 57a); Brief for American Arbitration Association as *Amicus Curiae* 17. Should petitioners refuse to proceed with what they maintain is essentially an ultra vires proceeding, they would almost certainly be subject to a petition to compel arbitration under 9 U. S. C. §4. Cf. *Regional Rail Reorganization Act Cases*, 419 U. S. 102, 143 (1974) ("Where the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect"). We think it is clear on these facts that petitioners have demonstrated sufficient hardship, and that their question is fit for our review at this time. To the extent the dissent believes that the question is prudentially unripe, we reject that argument as waived, *Sprietsma* v. *Mercury Marine*, 537 U. S. 51, 56, n. 4 (2002), and we see no reason to disregard the waiver. We express no view as to whether, in a similar case, a federal court may consider a question of prudential ripeness on its own motion. See *National Park Hospitality Assn.*, *supra*, at 808 ("[E]ven in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion").

## II

### A

Petitioners contend that the decision of the arbitration panel must be vacated, but in order to obtain that relief, they must clear a high hurdle. It is not enough for petitioners to show that the panel committed an error—or even a serious error. See *Eastern Associated Coal Corp.* v. *Mine Workers*, 531 U. S. 57, 62 (2000); *Paperworkers* v. *Misco, Inc.*, 484 U. S. 29, 38 (1987). "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Major League Baseball Players Assn.* v. *Garvey*, 532 U. S. 504, 509 (2001) *(per curiam)* (quoting *Steelworkers* v. *Enterprise Wheel & Car Corp.*, 363 U. S. 593, 597 (1960)). In that situation, an arbitration decision may be vacated under §10(a)(4) of the FAA on the ground that the arbitrator "exceeded [his] powers," for the task of an arbitrator is to interpret and enforce a contract, not to make public policy. In this case, we must conclude that what the arbitration panel did was simply to impose its own view of sound policy regarding class arbitration.[3]

### B

#### 1

In its memorandum of law filed in the arbitration pro-

_____

[3] We do not decide whether "'manifest disregard'" survives our decision in *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 585 (2008), as an independent ground for review or as a judicial gloss on the enumerated grounds for vacatur set forth at 9 U. S. C. §10. Animal-Feeds characterizes that standard as requiring a showing that the arbitrators "knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." Brief for Respondent 25 (internal quotation marks omitted). Assuming, *arguendo,* that such a standard applies, we find it satisfied for the reasons that follow.

ceedings, AnimalFeeds made three arguments in support of construing the arbitration clause to permit class arbitration:

> "The parties' arbitration clause should be construed to allow class arbitration because (a) the clause is silent on the issue of class treatment and, without express prohibition, class arbitration is permitted under *Bazzle*; *(b) the clause should be construed to permit class arbitration as a matter of public policy*; and (c) the clause would be unconscionable and unenforceable if it forbade class arbitration."  App. in No. 06–3474–cv (CA2), at A–308 to A–309 (emphasis added).

The arbitrators expressly rejected AnimalFeeds' first argument, see App. to Pet. for Cert. 49a, and said nothing about the third.  Instead, the panel appears to have rested its decision on AnimalFeeds' public policy argument. Because the parties agreed their agreement was "silent" in the sense that they had not reached any agreement on the issue of class arbitration, the arbitrators' proper task was to identify the rule of law that governs in that situation. Had they engaged in that undertaking, they presumably would have looked either to the FAA itself or to one of the two bodies of law that the parties claimed were governing, *i.e.*, either federal maritime law or New York law.  But the panel did not consider whether the FAA provides the rule of decision in such a situation; nor did the panel attempt to determine what rule would govern under either maritime or New York law in the case of a "silent" contract. Instead, the panel based its decision on post-*Bazzle* arbitral decisions that "construed a wide variety of clauses in a wide variety of settings as allowing for class arbitration." App. to Pet. for Cert. 49a–50a.  The panel did not mention whether any of these decisions were based on a rule de-

rived from the FAA or on maritime or New York law.[4]

Rather than inquiring whether the FAA, maritime law, or New York law contains a "default rule" under which an arbitration clause is construed as allowing class arbitration in the absence of express consent, the panel proceeded as if it had the authority of a common-law court to develop what it viewed as the best rule to be applied in such a situation. Perceiving a post-*Bazzle* consensus among arbitrators that class arbitration is beneficial in "a wide variety of settings," the panel considered only whether there was any good reason not to follow that consensus in this case. App. to Pet. for Cert. 49a–50a. The panel was not persuaded by "court cases denying consolidation of arbitrations,"[5] by undisputed evidence that the Vegoilvoy charter party had "never been the basis of a class action," or by expert opinion that "sophisticated, multinational commercial parties of the type that are sought to be in-

————————

[4] The panel's reliance on these arbitral awards confirms that the panel's decision was not based on a determination regarding the parties' intent. All of the arbitral awards were made under the AAA's Class Rules, which were adopted in 2003, and thus none was available when the parties here entered into the Vegoilvoy charter party during the class period ranging from 1998 to 2002. See 548 F. 3d 85, 87 (CA2 2008) (defining the class period). Indeed, at the hearing before the panel, counsel for AnimalFeeds conceded that "[w]hen you talk about expectations, virtually every one of the arbitration clauses that were the subject of the 25 AAA decisions were drafted before *[Bazzle]*. So therefore, if you are going to talk about the parties' intentions, pre-*[Bazzle]* class arbitrations were not common, post *[Bazzle]* they are common." App. 87a. Moreover, in its award, the panel appeared to acknowledge that none of the cited arbitration awards involved a contract between sophisticated business entities. See App. to Pet. for Cert. 50a.

[5] See *Government of United Kingdom* v. *Boeing Co.*, 998 F. 2d 68, 71, 74 (CA2 1993); see also *Glencore, Ltd.* v. *Schnitzer Steel Prods. Co.*, 189 F. 3d 264, 268 (CA2 1999); *Champ* v. *Siegel Trading Co.*, 55 F. 3d 269, 275 (CA7 1995). Unlike the subsequent arbitration awards that the arbitrators cited, these decisions were available to the parties when they entered into their contracts.

cluded in the class would never intend that the arbitration clauses would permit a class arbitration."[6]   *Id.,* at 50a–

_____

[6] Petitioners produced expert evidence from experienced maritime arbitrators demonstrating that it is customary in the shipping business for parties to resolve their disputes through bilateral arbitration.  See, *e.g.*, App. 126a (expert declaration of John Kimball) ("In the 30 years I have been practicing as a maritime lawyer, I have never encountered an arbitration clause in a charter party that could be construed as allowing class action arbitration"); *id.*, at 139a (expert declaration of Bruce Harris) ("I have been working as a maritime arbitrator for thirty years and this matter is the first I have ever encountered where the issue of a class action arbitration has even been raised").  These experts amplified their written statements in their live testimony, as well.  See, *e.g.*, App. 112a, 113a (Mr. Kimball) (opining that the prospect of a class action in a maritime arbitration would be "quite foreign" to overseas shipping executives and charterers); *id.*, at 111a–112a (Mr. Harris) (opining that in the view of the London Corps of International Arbitration, class arbitration is "inconceivable").

Under both New York law and general maritime law, evidence of "custom and usage" is relevant to determining the parties' intent when an express agreement is ambiguous.  See *Excess Ins. Co.* v. *Factory Mut. Ins. Co.*, 3 N. Y. 3d 577, 590–591, 822 N. E. 2d 768, 777 (2004) ("Our precedent establishes that where there is ambiguity in a reinsurance certificate, the surrounding circumstances, including industry custom and practice, should be taken into consideration"); *Lopez* v. *Consolidated Edison Co. of N. Y.,* 40 N. Y. 2d 605, 609, 357 N. E. 2d 951, 954–955 (1976) (where contract terms were ambiguous, parol evidence of custom and practice was properly admitted to show parties' intent); *407 East 61st Garage, Inc.* v. *Savoy Fifth Avenue Corp.*, 23 N. Y. 2d 275, 281, 244 N. E. 2d 37, 41 (1968) (contract was "not so free from ambiguity to preclude extrinsic evidence" of industry "custom and usage" that would "establish the correct interpretation or understanding of the agreement as to its term").  See also *Great Circle Lines, Ltd.* v. *Matheson & Co.*, 681 F. 2d 121, 125 (CA2 1982) ("Certain longstanding customs of the shipping industry are crucial factors to be considered when deciding whether there has been a meeting of the minds on a maritime contract"); *Samsun Corp.* v. *Khozestan Mashine Kar Co.*, 926 F. Supp. 436, 439 (SDNY 1996) ("[W]here as here the contract is one of charter party, established practices and customs of the shipping industry inform the court's analysis of what the parties agreed to"); Hough, Admiralty Jurisdiction—Of Late Years, 37 Harv. L. Rev. 529, 536 (1924) (noting that "maritime law is a body of sea

51a. Accordingly, finding no convincing ground for depart-
ing from the post-*Bazzle* arbitral consensus, the panel held
that class arbitration was permitted in this case. App. to
Pet. for Cert. 52a. The conclusion is inescapable that the
panel simply imposed its own conception of sound policy.[7]

### 2

It is true that the panel opinion makes a few references
to intent, but none of these shows that the panel did any-
thing other than impose its own policy preference. The
opinion states that, under *Bazzle*, "arbitrators must look
to the language of the parties' agreement to ascertain the
parties' intention whether they intended to permit or to
preclude class action," and the panel added that "[t]his is
also consistent with New York law." App. to Pet. for Cert.
49a. But the panel had no occasion to "ascertain the
parties' intention" in the present case because the parties
were in complete agreement regarding their intent. In the
very next sentence after the one quoted above, the panel

————————

customs" and the "custom of the sea . . . includes a customary interpre-
tation of contract language").

[7] The dissent calls this conclusion "hardly fair," noting that the word
"'policy' is not so much as mentioned in the arbitrators' award." *Post*,
at 8. But just as merely saying something is so does not make it so, cf.
*United States* v. *Morrison*, 529 U. S. 598, 614 (2000), the arbitrators
need not have said they were relying on policy to make it so. At the
hearing before the arbitration panel, one of the arbitrators recognized
that the body of post-*Bazzle* arbitration awards on which AnimalFeeds
relied involved "essentially consumer non-value cases." App. 82a. In
response, counsel for AnimalFeeds defended the applicability of those
awards by asserting that the "vast majority" of the claimants against
petitioners "have negative value claims . . . meaning it costs more to
litigate than you would get if you won." *Id.*, at 82a–83a. The panel
credited this body of awards in concluding that petitioners had not
demonstrated the parties' intent to preclude class arbitration, and
further observed that if petitioners' anticonsolidation precedents
controlled, then "there would appear to be no basis for a class action
absent express agreement among all parties and the putative class
members." App. to Pet. for Cert. 50a, 51a.

acknowledged that the parties in this case agreed that the Vegoilvoy charter party was "silent on whether [it] permit[ted] or preclude[d] class arbitration," but that the charter party was "not ambiguous so as to call for parol evidence." *Ibid.* This stipulation left no room for an inquiry regarding the parties' intent, and any inquiry into that settled question would have been outside the panel's assigned task.

The panel also commented on the breadth of the language in the Vegoilvoy charter party, see *id.*, at 50a, but since the only task that was left for the panel, in light of the parties' stipulation, was to identify the governing rule applicable in a case in which neither the language of the contract nor any other evidence established that the parties had reached any agreement on the question of class arbitration, the particular wording of the charter party was quite beside the point.

In sum, instead of identifying and applying a rule of decision derived from the FAA or either maritime or New York law, the arbitration panel imposed its own policy choice and thus exceeded its powers. As a result, under §10(b) of the FAA, we must either "direct a rehearing by the arbitrators" or decide the question that was originally referred to the panel. Because we conclude that there can be only one possible outcome on the facts before us, we see no need to direct a rehearing by the arbitrators.

## III

### A

The arbitration panel thought that *Bazzle* "controlled" the "resolution" of the question whether the Vegoilvoy charter party "permit[s] this arbitration to proceed on behalf of a class," App. to Pet. for Cert. 48a–49a, but that understanding was incorrect.

*Bazzle* concerned contracts between a commercial lender (Green Tree) and its customers. These contracts con-

tained an arbitration clause but did not expressly mention class arbitration. Nevertheless, an arbitrator conducted class arbitration proceedings and entered awards for the customers.

The South Carolina Supreme Court affirmed the awards. *Bazzle* v. *Green Tree Financial Corp.*, 351 S. C. 244, 569 S. E. 2d 349 (2002). After discussing both Seventh Circuit precedent holding that a court lacks authority to order classwide arbitration under §4 of the FAA, see *Champ* v. *Siegel Trading Co.,* 55 F. 3d 269 (1995), and conflicting California precedent, see *Keating* v. *Superior Court of Alameda Cty.*, 31 Cal. 3d 584, 645 P. 2d 1192 (1982), the State Supreme Court elected to follow the California approach, which it characterized as permitting a trial court to "order class-wide arbitration under adhesive but enforceable franchise contracts," 351 S. C., at 259, 266, 569 S. E. 2d, at 357, 360. Under this approach, the South Carolina court observed, a trial judge must "[b]alanc[e] the potential inequities and inefficiencies" of requiring each aggrieved party to proceed on an individual basis against "resulting prejudice to the drafting party" and should take into account factors such as "efficiency" and "equity." *Id.,* at 260, and n. 15, 569 S. E. 2d, at 357, and n. 15.

Applying these standards to the case before it, the South Carolina Supreme Court found that the arbitration clause in the Green Tree contracts was "silent regarding classwide arbitration." *Id.,* at 263, 569 S. E. 2d, at 359 (emphasis deleted). The Court described its holding as follows:

> "[W]e . . . hold that class-wide arbitration may be ordered when the arbitration agreement is silent if it would serve efficiency and equity, and would not result in prejudice. If we enforced a mandatory, adhesive arbitration clause, but prohibited class actions in

arbitration where the agreement is silent, the drafting party could effectively prevent class actions against it without having to say it was doing so in the agreement." *Id.,* at 266, 569 S. E. 2d, at 360 (footnote omitted).

When *Bazzle* reached this Court, no single rationale commanded a majority. The opinions of the Justices who joined the judgment—that is, the plurality opinion and JUSTICE STEVENS' opinion—collectively addressed three separate questions. The first was which decision maker (court or arbitrator) should decide whether the contracts in question were "silent" on the issue of class arbitration. The second was what standard the appropriate decision maker should apply in determining whether a contract allows class arbitration. (For example, does the FAA entirely preclude class arbitration? Does the FAA permit class arbitration only under limited circumstances, such as when the contract expressly so provides? Or is this question left entirely to state law?) The final question was whether, under whatever standard is appropriate, class arbitration had been properly ordered in the case at hand.

The plurality opinion decided only the first question, concluding that the arbitrator and not a court should decide whether the contracts were indeed "silent" on the issue of class arbitration. The plurality noted that, "[i]n certain limited circumstances," involving "gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy," it is assumed "that the parties intended courts, not arbitrators," to make the decision. 539 U. S., at 452. But the plurality opined that the question whether a contract with an arbitration clause forbids class arbitration "does not fall into this narrow exception." *Ibid.* The plurality there-

fore concluded that the decision of the State Supreme Court should be vacated and that the case should be remanded for a decision by the arbitrator on the question whether the contracts were indeed "silent." The plurality did not decide either the second or the third question noted above.

JUSTICE STEVENS concurred in the judgment vacating and remanding because otherwise there would have been "no controlling judgment of the Court," but he did not endorse the plurality's rationale. *Id.,* at 455 (opinion concurring in judgment and dissenting in part). He did not take a definitive position on the first question, stating only that *"[a]rguably* the interpretation of the parties' agreement should have been made in the first instance by the arbitrator." *Ibid.* (emphasis added). But because he did not believe that Green Tree had raised the question of the appropriate decision maker, he preferred not to reach that question and, instead, would have affirmed the decision of the State Supreme Court on the ground that "the decision to conduct a class-action arbitration was correct as a matter of law." *Ibid.* Accordingly, his analysis bypassed the first question noted above and rested instead on his resolution of the second and third questions. Thus, *Bazzle* did not yield a majority decision on any of the three questions.

## B

Unfortunately, the opinions in *Bazzle* appear to have baffled the parties in this case at the time of the arbitration proceeding. For one thing, the parties appear to have believed that the judgment in *Bazzle* requires an arbitrator, not a court, to decide whether a contract permits class arbitration. See App. 89a (transcript of argument before arbitration panel) (counsel for Stolt-Nielsen states: "What *[Bazzle]* says is that the contract interpretation issue is left up to the arbitrator, that's the rule in *[Bazzle]*"). In

fact, however, only the plurality decided that question. But we need not revisit that question here because the parties' supplemental agreement expressly assigned this issue to the arbitration panel, and no party argues that this assignment was impermissible.

Unfortunately, however, both the parties and the arbitration panel seem to have misunderstood *Bazzle* in another respect, namely, that it established the standard to be applied by a decision maker in determining whether a contract may permissibly be interpreted to allow class arbitration. The arbitration panel began its discussion by stating that the parties "differ regarding *the rule of interpretation* to be gleaned from [the *Bazzle*] decision." App. to Pet. for Cert. 49a (emphasis added). The panel continued:

> "Claimants argue that *Bazzle* requires clear language that forbids class arbitration in order to bar a class action. The Panel, however, agrees with Respondents that the test is a more general one—arbitrators must look to the language of the parties' agreement to ascertain the parties' intention whether they intended to permit or to preclude class action." *Ibid.*

As we have explained, however, *Bazzle* did not establish the rule to be applied in deciding whether class arbitration is permitted.[8] The decision in *Bazzle* left that question

_____

[8] AnimalFeeds invokes the parties' supplemental agreement as evidence that petitioners "waived" any claim that the arbitrators could not construe the arbitration agreement to permit class arbitration. Brief for Respondent 15. The dissent concludes, likewise, that the existence of the parties' supplemental agreement renders petitioners' argument under §10(a)(4) "scarcely debatable." *Post*, at 7. These arguments are easily answered by the clear terms of the supplemental agreement itself. The parties expressly provided that their supplemental agreement "*does not alter* the scope of the Parties' arbitration agreements in any Charter Party Agreement," and that "[n]either the fact of this Agreement nor any of its terms may be used to support or oppose *any*

open, and we turn to it now.

## IV

While the interpretation of an arbitration agreement is generally a matter of state law, see *Arthur Andersen LLP* v. *Carlisle*, 556 U. S. \_\_\_, \_\_\_ (2009) (slip op., at 6); *Perry* v. *Thomas*, 482 U. S. 483, 493, n. 9 (1987), the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration "is a matter of consent, not coercion," *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 479 (1989).

## A

In 1925, Congress enacted the United States Arbitration Act, as the FAA was formerly known, for the express purpose of making "valid and enforceable written provisions or agreements for arbitration of disputes arising out of contracts, maritime transactions, or commerce among the States or Territories or with foreign nations." 43 Stat. 883. Reenacted and codified in 1947, see 61 Stat. 669,[9] the

_____

*argument in favor of a class action arbitration . . .* and may not be relied upon by the Parties, any arbitration panel, *any court*, or any other tribunal for such purposes." App. to Pet. for Cert. 62a–63a (emphasis added). As with any agreement to arbitrate, we are obliged to enforce the parties' supplemental agreement "according to its terms." *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S. 52, 58 (1995). The question that the arbitration panel was charged with deciding was whether the arbitration clause in the Vegoilvoy charter party allowed for class arbitration, and nothing in the supplemental agreement conferred authority on the arbitrators to exceed the terms of the charter party itself. Thus, contrary to AnimalFeeds' argument, these statements show that petitioners did *not* waive their argument that *Bazzle* did not establish the standard for the decision maker to apply when construing an arbitration clause.

[9] See generally Sturges & Murphy, Some Confusing Matters Relating to Arbitration Under the United States Arbitration Act, 17 Law & Contemp. Prob. 580, 580–581, n. 1 (1952) (recounting the history of the United States Arbitration Act and its 1947 reenactment and

FAA provides, in pertinent part, that a "written provision in any maritime transaction" calling for the arbitration of a controversy arising out of such transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract," 9 U. S. C. §2.  Under the FAA, a party to an arbitration agreement may petition a United States district court for an order directing that "arbitration proceed in the manner provided for in such agreement."  §4.  Consistent with these provisions, we have said on numerous occasions that the central or "primary" purpose of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms."  *Volt, supra,* at 479; *Mastrobuono* v. *Shearson Lehman Hutton, Inc.*, 514 U. S. 52, 57, 58 (1995); see also *Doctor's Associates, Inc.* v. *Casarotto*, 517 U. S. 681, 688 (1996).  See generally 9 U. S. C. §4.

Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must "give effect to the contractual rights and expectations of the parties."  *Volt*, *supra,* at 479.  In this endeavor, "as with any other contract, the parties' intentions control." *Mitsubishi Motors Corp.* v. *Soler Chrysler-Plymouth, Inc.*, 473 U. S. 614, 626 (1985).  This is because an arbitrator derives his or her powers from the parties' agreement to forgo the legal process and submit their disputes to private dispute resolution.  See *AT&T Technologies, Inc.* v. *Communications Workers*, 475 U. S. 643, 648–649 (1986) ("[A]rbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration"); *Mitsubishi Motors*, *supra*, at 628 ("By agreeing to arbitrate . . . , [a party] trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration");

————————

codification).

see also *Steelworkers* v. *Warrior & Gulf Nav. Co.*, 363 U. S. 574, 581 (1960) (an arbitrator "has no general charter to administer justice for a community which transcends the parties" but rather is "part of a system of self-government created by and confined to the parties" (internal quotation marks omitted)).

Underscoring the consensual nature of private dispute resolution, we have held that parties are "'generally free to structure their arbitration agreements as they see fit.'" *Mastrobuono*, *supra,* at 57; see also *AT&T Technologies*, *supra,* at 648–649. For example, we have held that parties may agree to limit the issues they choose to arbitrate, see *Mitsubishi Motors*, *supra,* at 628, and may agree on rules under which any arbitration will proceed, *Volt*, *supra,* at 479. They may choose who will resolve specific disputes. *E.g.*, App. 30a; *Alexander* v. *Gardner-Denver Co.*, 415 U. S. 36, 57 (1974); *Burchell* v. *Marsh*, 17 How. 344, 349 (1855); see also *International Produce, Inc.* v. *A/S Rosshavet*, 638 F. 2d 548, 552 (CA2) ("The most sought-after arbitrators are those who are prominent and experienced members of the specific business community in which the dispute to be arbitrated arose"), cert. denied, 451 U. S. 1017 (1981).

We think it is also clear from our precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes. See *EEOC* v. *Waffle House, Inc.*, 534 U. S. 279, 289 (2002) ("[N]othing in the [FAA] authorizes a court to compel arbitration of any issues, *or by any parties*, that are not already covered in the agreement" (emphasis added)); *Moses H. Cone Memorial Hospital* v. *Mercury Constr. Corp.*, 460 U. S. 1, 20 (1983) ("[A]n arbitration agreement must be enforced notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement"); *Steelworkers*, *supra,* at 581 (an arbitrator "has no general charter to administer jus-

tice for a community which transcends the parties" (internal quotation marks omitted)); accord, *First Options of Chicago, Inc.* v. *Kaplan*, 514 U. S. 938, 943 (1995) ("[A]rbitration is simply a matter of contract *between the parties*; it is a way to resolve those disputes—but only those disputes—that the *parties* have agreed to submit to arbitration" (emphasis added)).   It falls to courts and arbitrators to give effect to these contractual limitations, and when doing so, courts and arbitrators must not lose sight of the purpose of the exercise: to give effect to the intent of the parties.   *Volt*, 489 U. S., at 479.

B

From these principles, it follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so.   In this case, however, the arbitration panel imposed class arbitration even though the parties concurred that they had reached "no agreement" on that issue, see App. 77a.   The critical point, in the view of the arbitration panel, was that petitioners did not "establish that the parties to the charter agreements intended to *preclude* class arbitration."   App. to Pet. for Cert. 51a.   Even though the parties are sophisticated business entities, even though there is no tradition of class arbitration under maritime law, and even though AnimalFeeds does not dispute that it is customary for the shipper to choose the charter party that is used for a particular shipment, the panel regarded the agreement's silence on the question of class arbitration as dispositive.   The panel's conclusion is fundamentally at war with the foundational FAA principle that arbitration is a matter of consent.

In certain contexts, it is appropriate to presume that parties that enter into an arbitration agreement implicitly authorize the arbitrator to adopt such procedures as are

necessary to give effect to the parties' agreement. Thus, we have said that "'"procedural" questions which grow out of the dispute and bear on its final disposition' are presumptively not for the judge, but for an arbitrator, to decide." *Howsam* v. *Dean Witter Reynolds, Inc.*, 537 U. S. 79, 84 (2002) (quoting *John Wiley & Sons, Inc.* v. *Livingston*, 376 U. S. 543, 557 (1964)). This recognition is grounded in the background principle that "[w]hen the parties to a bargain sufficiently defined to be a contract have not agreed with respect to a term which is essential to a determination of their rights and duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts §204 (1979).

An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate. This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator. In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes. See *Gilmer* v. *Interstate/Johnson Lane Corp.*, 500 U. S. 20, 31 (1991); *Mitsubishi Motors*, 473 U. S., at 628; see also *14 Penn Plaza LLC* v. *Pyett*, 556 U. S. ___, ___ (2009) (slip. op., at 7–8) ("Parties generally favor arbitration precisely because of the economics of dispute resolution" (citing *Circuit City Stores, Inc.* v. *Adams*, 532 U. S. 105, 123 (2001)); *Gardner-Denver*, *supra,* at 57 ("Parties usually choose an arbitrator because they trust his knowledge and judgment concerning the demands and norms of industrial relations"). But the relative benefits of class-action arbitration are much less assured, giving reason to doubt the parties' mutual

consent to resolve disputes through class-wide arbitration. Cf. *First Options*, *supra,* at 945 (noting that "one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power, for doing so might too often force unwilling parties to arbitrate" contrary to their expectations).

Consider just some of the fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration. An arbitrator chosen according to an agreed-upon procedure, see, *e.g.*, *supra*, at 2, no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties. See App. 86a ("[W]e believe domestic class members could be in the hundreds" and that "[t]here could be class members that ship to and from the U. S. who are not domestic who we think would be covered"); see also, *e.g.*, *Bazzle*, 351 S. C., at 251, 569 S. E. 2d, at 352–353 (involving a class of 1,899 individuals that was awarded damages, fees, and costs of more than $14 million by a single arbitrator). Under the Class Rules, "the presumption of privacy and confidentiality" that applies in many bilateral arbitrations "shall not apply in class arbitrations," see Addendum to Brief for American Arbitration Association as *Amicus Curiae* 10a (Class Rule 9(a)), thus potentially frustrating the parties' assumptions when they agreed to arbitrate. The arbitrator's award no longer purports to bind just the parties to a single arbitration agreement, but adjudicates the rights of absent parties as well. Cf. *Ortiz* v. *Fibreboard Corp.*, 527 U. S. 815, 846 (1999) (noting that "the burden of justification rests on the exception" to the general rule that "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party or to which he has not been made a party by service of process" (internal quotation marks omitted)). And the commercial stakes of class-action

arbitration are comparable to those of class-action litigation, cf. App. in No. 06–3474–cv (CA2), at A–77, A–79, ¶¶30, 31, 40, even though the scope of judicial review is much more limited, see *Hall Street*, 552 U. S., at 588. We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, consistent with their limited powers under the FAA, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings.[10]

The dissent minimizes these crucial differences by characterizing the question before the arbitrators as being merely what "procedural mode" was available to present AnimalFeeds' claims. *Post*, at 9. If the question were that simple, there would be no need to consider the parties' intent with respect to class arbitration. See *Howsam*, *supra*, at 84 (committing "procedural questions" presumptively to the arbitrator's discretion (internal quotation marks omitted)). But the FAA requires more. Contrary to the dissent, but consistent with our precedents emphasizing the consensual basis of arbitration, we see the question as being whether the parties *agreed to authorize* class arbitration. Here, where the parties stipulated that there was "no agreement" on this question, it follows that the parties cannot be compelled to submit their dispute to class arbitration.

## V

For these reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

––––––––––

[10] We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration. Here, as noted, the parties stipulated that there was "no agreement" on the issue of class-action arbitration. App. 77a.

JUSTICE SOTOMAYOR took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

───────────

No. 08–1198

───────────

## STOLT-NIELSEN S. A., et al., PETITIONERS *v.* ANIMALFEEDS INTERNATIONAL CORP.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SECOND CIRCUIT

[April 27, 2010]

Justice Ginsburg, with whom Justice Stevens and Justice Breyer join, dissenting.

When an arbitration clause is silent on the question, may arbitration proceed on behalf of a class? The Court prematurely takes up that important question and, indulging in *de novo* review, overturns the ruling of experienced arbitrators.[1]

The Court errs in addressing an issue not ripe for judicial review. Compounding that error, the Court substitutes its judgment for that of the decisionmakers chosen by the parties. I would dismiss the petition as improvidently granted.[2] Were I to reach the merits, I would adhere to the strict limitations the Federal Arbitration Act (FAA), 9 U. S. C. §1 *et seq.*, places on judicial review of arbitral awards. §10. Accordingly, I would affirm the judgment of the Second Circuit, which rejected petitioners' plea for vacation of the arbitrators' decision.

## I

As the Court recounts, *ante*, at 2–6, this case was launched as a class action in federal court charging named

───────────

[1] All three panelists are leaders in the international-dispute-resolution bar. See Brief for Respondent 8–9.

[2] Alternatively, I would vacate with instructions to dismiss for lack of present jurisdiction. See Reply to Brief in Opposition 12, n. 6.

ocean carriers (collectively, Stolt-Nielsen) with a conspiracy to extract supracompetitive prices from their customers (buyers of ocean-transportation services). That court action terminated when the Second Circuit held, first, that the parties' transactions were governed by contracts (charter parties) with enforceable arbitration clauses, and second, that the antitrust claims were arbitrable. *JLM Industries, Inc.* v. *Stolt-Nielsen S. A.*, 387 F. 3d 163, 175, 181 (2004).

Cargo-shipper AnimalFeeds International Corp. (AnimalFeeds) thereupon filed a demand for class arbitration of the antitrust-conspiracy claims.[3] Stolt-Nielsen contested AnimalFeeds' right to proceed on behalf of a class, but agreed to submission of that threshold dispute to a panel of arbitrators. Thus, the parties entered into a supplemental agreement to choose arbitrators and instruct them to "follow . . . Rul[e] 3 . . . of the American Arbitration Association's Supplementary Rules for Class Arbitrations." App. to Pet. for Cert. 59a. Rule 3, in turn, directed the panel to "determine . . . whether the applicable arbitration clause permits the arbitration to proceed on behalf of . . . a class." App. 56a.

After receiving written submissions and hearing arguments, the arbitration panel rendered a clause-construction award. It decided unanimously—and only—that the "arbitration claus[e] [used in the parties' standard-form shipping contracts] permit[s] this . . . arbitration to proceed as a class arbitration." App. to Pet. for Cert. 52a. Stolt-Nielsen petitioned for court review urging vacatur of the clause-construction award on the ground

---

[3] Counsel for AnimalFeeds submitted in arbitration that "[i]t would cost . . . the vast majority of absent class members, and indeed the current claimants, . . . more to litigate the matter on an individual basis than they could recover. An antitrust case, particularly involving an international cartel[,] . . . is extraordinarily difficult and expensive to litigate." App. 82a (paragraph break omitted).

that "the arbitrators [had] exceeded their powers." §10(a)(4). The Court of Appeals upheld the award: "Because the parties specifically agreed that the arbitration panel would decide whether the arbitration claus[e] permitted class arbitration," the Second Circuit reasoned, "the arbitration panel did not exceed its authority in deciding that issue—irrespective of whether it decided the issue correctly." 548 F. 3d 85, 101 (2008).

## II

I consider, first, the fitness of the arbitrators' clause-construction award for judicial review. The arbitrators decided the issue, in accord with the parties' supplemental agreement, "as a threshold matter." App. 56a. Their decision that the charter-party arbitration clause permitted class arbitration was abstract and highly interlocutory. The panel did not decide whether the particular claims AnimalFeeds advanced were suitable for class resolution, see App. to Pet. for Cert. 48a–49a; much less did it delineate any class or consider whether, "if a class is certified, . . . members of the putative class should be required to 'opt in' to th[e] proceeding," *id.*, at 52a.

The Court, *ante*, at 6, n. 2, does not persuasively justify judicial intervention so early in the game or convincingly reconcile its adjudication with the firm final-judgment rule prevailing in the federal court system. See, *e.g.*, 28 U. S. C. §1257 (providing for petitions for certiorari from "[f]inal judgments or decrees" of state courts); §1291 (providing for Court of Appeals review of district court "final decisions"); *Catlin* v. *United States*, 324 U. S. 229, 233 (1945) (describing "final decision" generally as "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment").

We have equated to "final decisions" a slim set of "collateral orders" that share these characteristics: They "are conclusive, [they] resolve important questions separate

from the merits, and [they] are effectively unreviewable on appeal from the final judgment in the underlying action." *Mohawk Industries, Inc.* v. *Carpenter*, 558 U. S. ___, ___ (2009) (slip op., at 4–5) (quoting *Swint* v. *Chambers County Comm'n*, 514 U. S. 35, 42 (1995)). "[O]rders relating to class certification" in federal court, it is settled, do not fit that bill. *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 470 (1978).[4]

Congress, of course, can provide exceptions to the "final-decision" rule. Prescriptions in point include §1292 (immediately appealable "[i]nterlocutory decisions"); §2072(c) (authorizing promulgation of rules defining when a district court ruling is final for purposes of appeal under §1291); Fed. Rule Civ. Proc. 23(f) (pursuant to §1292(e), accords Courts of Appeals discretion to permit appeals from district court orders granting or denying class-action certification); Fed. Rule Civ. Proc. 54(b) (providing for "entry of a final judgment as to one or more, but fewer than all, of the claims or parties"). Did Congress provide for immediate review of the preliminary ruling in question here?

Section 16 of the FAA, governing appellate review of district court arbitration orders, lists as an appealable disposition a district court decision "confirming or denying confirmation of an award or partial award." 9 U. S. C. §16(a)(1)(D). Notably, the arbitrators in the matter at hand labeled their decision "Partial Final Clause Construction Award." App. to Pet. for Cert. 45a. It cannot be true, however, that parties or arbitrators can gain instant review by slicing off a preliminary decision or a procedural

_____

[4] Federal Rule of Civil Procedure 23(f), adopted in response to *Coopers & Lybrand*, gives Courts of Appeals discretion to permit an appeal from an order granting or denying class-action certification. But the rule would not permit review of a preliminary order of the kind at issue here, *i.e.*, one that defers decision whether to grant or deny certification.

order and declaring its resolution a "partial award." Cf. *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 588 (2008) (FAA §§9–11, which provide for expedited review to confirm, vacate, or modify arbitration awards, "substantiat[e] a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway.").

Lacking this Court's definitive guidance, some Courts of Appeals have reviewed arbitration awards "finally and definitely dispos[ing] of a separate independent claim." *E.g.*, *Metallgesellschaft A. G.* v. *M/V Capitan Constante*, 790 F. 2d 280, 283 (CA2 1986).[5] Others have considered "partial award[s]" that finally "determin[e] liability, but . . . not . . . damages." *E.g.*, *Hart Surgical, Inc.* v. *Ultracision, Inc.*, 244 F. 3d 231, 234 (CA1 2001).[6] Another confirmed an interim ruling on a "separate, discrete, independent, severable issue." *Island Creek Coal Sales Co.* v. *Gainesville*, 729 F. 2d 1046, 1049 (CA6 1984) (internal quotation marks omitted), abrogated on other grounds by *Cortez Byrd Chips, Inc.* v. *Bill Harbert Constr. Co.*, 529 U. S. 193 (2000).

Receptivity to review of preliminary rulings rendered by arbitrators, however, is hardly universal. See *Dealer Computer Servs., Inc.* v. *Dub Herring Ford*, 547 F. 3d 558 (CA6 2008) (arbitration panel's preliminary ruling that contract did not bar class proceedings held not ripe for review; arbitrators had not yet determined that arbitration *should* proceed on behalf of a class); *Metallgesellschaft A. G.*, 790 F. 2d, at 283, 285 (Feinberg, C. J., dissenting)

––––––––

[5] See *Metallgesellschaft A. G.*, 790 F. 2d, at 283, 284 (Feinberg, C. J., dissenting) (describing exception for separate and independent claims as "creat[ing], in effect, an arbitration analogue to [Fed. Rule Civ. Proc.] 54(b)").

[6] But see *Liberty Mut. Ins. Co.* v. *Wetzel*, 424 U. S. 737 (1976) (district court order determining liability but reserving decision on damages held not immediately appealable).

("[Piecemeal review] will make arbitration more like litigation, a result not to be desired. It would be better to minimize the number of occasions the parties to arbitration can come to court; on the whole, this benefits the parties, the arbitration process and the courts.").

While lower court opinions are thus divided, this much is plain: No decision of this Court, until today, has ever approved immediate judicial review of an arbitrator's decision as preliminary as the "partial award" made in this case.[7]

### III

Even if Stolt-Nielsen had a plea ripe for judicial review, the Court should reject it on the merits. Recall that the parties jointly asked the arbitrators to decide, initially, whether the arbitration clause in their shipping contracts permitted class proceedings. See *supra*, at 2. The panel did just what it was commissioned to do. It construed the broad arbitration clause (covering "[a]ny dispute arising from the making, performance or termination of this Charter Party," App. to Pet. for Cert. 47a) and ruled, expressly and only, that the clause permitted class arbitration. The Court acts without warrant in allowing Stolt-Nielsen essentially to repudiate its submission of the contract-construction issue to the arbitration panel, and to gain, in place of the arbitrators' judgment, this Court's *de novo* determination.

### A

The controlling FAA prescription, §10(a),[8] authorizes a

---

[7] The parties agreed that the arbitrators would issue a "partial final award," and then "stay all proceedings . . . to permit any party to move a court of competent jurisdiction to confirm or to vacate" the award. App. 56a. But an arbitration agreement, we have held, cannot "expand judicial review" available under the FAA. *Hall Street Associates, L. L. C.* v. *Mattel, Inc.*, 552 U. S. 576, 587 (2008).

[8] Title 9 U. S. C. §10(a) provides:

court to vacate an arbitration panel's decision "only in very unusual circumstances." *First Options of Chicago, Inc.* v. *Kaplan*, 514 U. S. 938, 942 (1995). The four grounds for vacatur codified in §10(a) restate the long-standing rule that, "[i]f [an arbitration] award is within the submission, and contains the honest decision of the arbitrators, after a full and fair hearing of the parties, a court . . . will not set [the award] aside for error, either in law or fact." *Burchell* v. *Marsh*, 17 How. 344, 349 (1855).

The sole §10 ground Stolt-Nielsen invokes for vacating the arbitrators' decision is §10(a)(4). The question under that provision is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa* v. *Dean Witter Reynolds Inc.*, 121 F. 3d 818, 824 (CA2 1997); *Comprehensive Accounting Corp.* v. *Rudell*, 760 F. 2d 138, 140 (CA7 1985). The parties' supplemental agreement, referring the class-arbitration issue to an arbitration panel, undoubtedly empowered the arbitrators to render their clause-construction decision. That scarcely debatable point should resolve this case.

---

"In any of the following cases the United States court in and for the district wherein the award was made may make an order vacating the award upon the application of any party to the arbitration—

"(1) where the award was procured by corruption, fraud, or undue means;

"(2) where there was evident partiality or corruption in the arbitrators, or either of them;

"(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

"(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

B

The Court's characterization of the arbitration panel's decision as resting on "policy," not law, is hardly fair comment, for "policy" is not so much as mentioned in the arbitrators' award. Instead, the panel tied its conclusion that the arbitration clause permitted class arbitration, App. to Pet. for Cert. 52a, to New York law, federal maritime law, and decisions made by other panels pursuant to Rule 3 of the American Arbitration Association's Supplementary Rules for Class Arbitrations. *Id.*, at 49a–50a.

At the outset of its explanation, the panel rejected the argument, proffered by AnimalFeeds, that this Court's decision in *Green Tree Financial Corp.* v. *Bazzle*, 539 U. S. 444 (2003), settled the matter by "requir[ing] clear language that *forbids* class arbitration in order to bar a class action." App. to Pet. for Cert. 49a (emphasis added). Agreeing with Stolt-Nielsen in this regard, the panel said that the test it employed looked to the language of the particular agreement to gauge whether the parties "intended to permit or to preclude class action[s]." *Ibid.* Concentrating on the wording of the arbitration clause, the panel observed, is "consistent with New York law as articulated by the [New York] Court of Appeals . . . and with federal maritime law." *Ibid.*[9]

Emphasizing the breadth of the clause in question— "'any dispute arising from the making, performance or termination of this Charter Party' shall be put to arbitration," *id.*, at 50a—the panel noted that numerous other partial awards had relied on language similarly comprehensive to permit class proceedings "in a wide variety of settings." *Id.*, at 49a–50a. The panel further noted "that many of the other panels [had] rejected arguments similar to those advanced by [Stolt-Nielsen]." *Id.*, at 50a.

---

[9] On New York law, the panel referred to *Evans* v. *Famous Music Corp.*, 1 N. Y. 3d 452, 807 N. E. 2d 869 (2004).

The Court features a statement counsel for Animal-Feeds made at the hearing before the arbitration panel, and maintains that it belies any argument that the clause in question permits class arbitration: "All the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue." *Ante*, at 4 (quoting App. 77a); see *ante*, at 8, 11–12, 20, 23, and n. 10. The sentence quoted from the hearing transcript concluded: "therefore there has been *no agreement to bar class arbitrations*." App. 77a (emphasis added). Counsel quickly clarified his position: "It's also undisputed that the arbitration clause here contains broad language and this language should be interpreted to permit class arbitrations." *Id.*, at 79a. See also *id.*, at 80a (noting consistent recognition by arbitration panels that "a silent broadly worded arbitration clause, just like the one at issue here, should be construed to permit class arbitration"); *id.*, at 88a ("[B]road . . . language . . . silent as to class proceedings should be interpreted to permit a class proceeding.").

Stolt-Nielsen, the panel acknowledged, had vigorously argued, with the support of expert testimony, that "the bulk of international shippers would never intend to have their disputes decided in a class arbitration." App. to Pet. for Cert. 52a. That concern, the panel suggested, might be met at a later stage; "if a class is certified," the panel noted, class membership could be confined to those who affirmatively "'opt in'" to the proceeding. *Ibid.*

The question properly before the Court is not whether the arbitrators' ruling was erroneous, but whether the arbitrators "exceeded their powers." §10(a)(4). The arbitrators decided a threshold issue, explicitly committed to them, see *supra*, at 2, about the procedural mode available for presentation of AnimalFeeds' antitrust claims. Cf. *Shady Grove Orthopedic Associates, P. A.* v. *Allstate Ins. Co.*, 559 U. S. \_\_\_, \_\_\_ (2010) (plurality opinion) (slip op.,

at 13–14) ("[R]ules allowing multiple claims (and claims by or against multiple parties) to be litigated together . . . neither change plaintiffs' separate entitlements to relief nor abridge defendants' rights; they alter only how the claims are processed."). That the arbitrators endeavored to perform their assigned task honestly is not contested. "Courts . . . do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." *Paperworkers* v. *Misco, Inc.*, 484 U. S. 29, 38 (1987). The arbitrators here not merely "arguably," but certainly, "constru[ed] . . . the contract" with fidelity to their commission. *Ibid.* This Court, therefore, may not disturb the arbitrators' judgment, even if convinced that "serious error" infected the panel's award. *Ibid.*

C

The Court not only intrudes on a decision the parties referred to arbitrators. It compounds the intrusion by according the arbitrators no opportunity to clarify their decision and thereby to cure the error the Court perceives. Section 10(b), the Court asserts, invests in this tribunal authority to "decide the question that was originally referred to the panel." *Ante*, at 12. The controlling provision, however, says nothing of the kind. Section 10(b) reads, in full: "If an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, *direct a rehearing by the arbitrators*." (Emphasis added.) Just as §10(a)(4) provides no justification for the Court's disposition, see *supra*, at 6–9 and this page, so, too, §10(b) provides no grounding for the Court's peremptory action.

IV
A

For arbitrators to consider whether a claim should

proceed on a class basis, the Court apparently demands contractual language one can read as affirmatively authorizing class arbitration. See *ante*, at 20 ("[A] party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."); *ante*, at 23. The breadth of the arbitration clause, and the absence of any provision waiving or banning class proceedings,[10] will not do. *Ante*, at 20–23.

The Court ties the requirement of affirmative authorization to "the basic precept that arbitration 'is a matter of consent, not coercion.'" *Ante*, at 17 (quoting *Volt Information Sciences, Inc.* v. *Board of Trustees of Leland Stanford Junior Univ.*, 489 U. S. 468, 479 (1989)). Parties may "specify *with whom* they choose to arbitrate," the Court observes, just as they may "limit the issues they choose to arbitrate." *Ante*, at 19. But arbitrators, in delineating an appropriate class, need not, and should not, disregard such contractual constraints. In this case, for example, AnimalFeeds proposes to pursue, on behalf of a class, only "claims . . . arising out of any [charter party agreement] . . . *that provides for arbitration*." App. to Pet. for Cert. 56a (emphasis added). Should the arbitrators certify the proposed class, they would adjudicate only the rights of persons "with whom" Stolt-Nielsen agreed to arbitrate, and only "issues" subject to arbitration. *Ante*, at 19 (emphasis omitted).

———————

[10] Several courts have invalidated contractual bans on, or waivers of, class arbitration because proceeding on an individual basis was not feasible in view of the high costs entailed and the slim benefits achievable. See, *e.g.*, *In re American Express Merchants' Litigation*, 554 F. 3d 300, 315–316, 320 (CA2 2009); *Kristian* v. *Comcast Corp.*, 446 F. 3d 25, 55, 59 (CA1 2006); *Discover Bank* v. *Superior Court*, 36 Cal. 4th 148, 162–163, 113 P. 3d 1100, 1110 (2005); *Leonard* v. *Terminix Int'l Co., LP*, 854 So. 2d 529, 539 (Ala. 2002). Were there no right to proceed on behalf of a class in the first place, however, a provision banning or waiving recourse to this aggregation device would be superfluous.

The Court also links its affirmative-authorization requirement to the parties' right to stipulate rules under which arbitration may proceed. See *ibid.* The question, however, is the proper default rule when there is no stipulation. Arbitration provisions, this Court has noted, are a species of forum-selection clauses. See *Scherk* v. *Alberto-Culver Co.*, 417 U. S. 506, 519 (1974). Suppose the parties had chosen a New York *judicial forum* for resolution of "any dispute" involving a contract for ocean carriage of goods. There is little question that the designated court, state or federal, would have authority to conduct claims like AnimalFeeds' on a class basis. Why should the class-action prospect vanish when the "any dispute" clause is contained in an arbitration agreement? Cf. *Connecticut General Life Ins. Co.* v. *Sun Life Assurance Co. of Canada*, 210 F. 3d 771, 774–776 (CA7 2000) (reading contract's authorization to arbitrate "[a]ny dispute" to permit consolidation of arbitrations). If the Court is right that arbitrators ordinarily are not equipped to manage class proceedings, see *ante*, at 21–22, then the claimant should retain its right to proceed in that format in court.

B

When adjudication is costly and individual claims are no more than modest in size, class proceedings may be "the thing," *i.e.*, without them, potential claimants will have little, if any, incentive to seek vindication of their rights. *Amchem Products, Inc.* v. *Windsor*, 521 U. S. 591, 617 (1997); *Carnegie* v. *Household Int'l, Inc.*, 376 F. 3d 656, 661 (CA7 2004) ("The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."). Mindful that disallowance of class proceedings severely shrinks the dimensions of the case or controversy a claimant can mount, I note some stopping points in the Court's decision.

First, the Court does not insist on express consent to

class arbitration. Class arbitration may be ordered if "there is a contractual basis for concluding that the part[ies] *agreed*" "to submit to class arbitration". *Ante*, at 20; see *ante*, at 23, n. 10 ("We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration."). Second, by observing that "the parties [here] are sophisticated business entities," and "that it is customary for the shipper to choose the charter party that is used for a particular shipment," the Court apparently spares from its affirmative-authorization requirement contracts of adhesion presented on a take-it-or-leave-it basis. *Ante*, at 20. While these qualifications limit the scope of the Court's decision, I remain persuaded that the arbitrators' judgment should not have been disturbed.

\* \* \*

For the foregoing reasons, I would dismiss the petition for want of a controversy ripe for judicial review. Were I to reach the merits, I would affirm the Second Circuit's judgment confirming the arbitrators' clause-construction decision.